UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERRY A. MAIS, et al.,

        Plaintiffs,

                                  CASE NO. 1:12-CV-565

v.

                                  HON. ROBERT J. JONKER

ALLIANZ LIFE INSURANCE COMPANY
OF NORTH AMERICA,

        Defendant.

_____/

## OPINION

      Jerry Mais has been an Allianz customer since 2005.  Joseph Fabian was his Allianz agent. Allianz terminated Fabian's agency in 2007 because Fabian failed to renew his insurance license. The termination was "without cause," meaning that Fabian could no longer open or accept checks for new accounts but could continue to collect commissions and new customer money on existing Allianz accounts.  But Mais did not know about the change in agency authority—and Allianz never told him.  After Fabian's initial termination, Mais gave Fabian two large checks made out to Allianz, and Fabian converted them to his own use rather than apply them to new Allianz products.  Mais found out about this years later when the FBI investigated Fabian for wire fraud.  Mais filed this lawsuit to hold Allianz accountable for its agent's conduct.  This Court held a bench trial in this case on June 10–11, 2014.  This opinion constitutes the Court's findings of fact and conclusions of law on all triable issues under Federal Rule of Civil Procedure 52.

## I.   FINDINGS OF FACT

### A.   Mais Becomes an Allianz Customer

Jerry Mais purchased his first Allianz product in 2005.  That year, he actually purchased four Allianz products—two for himself and two for his wife.  Mais was introduced to Allianz products by Allianz agent Joseph Fabian.  Fabian was a third-party insurance agent and broker who operated his own independent office.  He had been an Allianz agent since 1998.  As its agent, Fabian had authority to sell Allianz products, accept checks on behalf of Allianz, and service existing Allianz accounts, which included authority to access confidential account information.  Operating out of his own office, Fabian independently recruited and cultivated Allianz clients to earn commissions.

Each time Mais purchased an Allianz product, he filled out an application with Fabian, and gave Fabian a check payable to Allianz.  Fabian would submit the application forms on Mais's behalf and Mais would receive confirmation of his new account from Allianz by mail.  Fabian also faithfully submitted Mais's checks to Allianz for the first four Allianz purchases.  Mais was pleased with the rate of return of his Allianz products and he developed greater trust in Fabian and Allianz.

### B.   Allianz Terminates Fabian Without Cause

On or about July 26, 2007, Allianz learned that Fabian had not renewed his license to sell insurance in Michigan.  As a result, it terminated Fabian "without cause."  Under Allianz policy, an agent terminated without cause is authorized to continue servicing existing accounts, which includes collecting any residual commissions on the business, and accepting checks on behalf of Allianz to deposit into those accounts.  Termination "for cause," by contrast, terminates such authorization and completely severs the agency relationship.  Accordingly, even after termination without cause in

2007, Fabian remained an agent of Allianz authorized to accept checks for existing accounts on Allianz's behalf.

### C.     Allianz Fails to Inform Its Clients of Fabian's Termination

Allianz did not inform Mais—or any other clients—that it had terminated Fabian in 2007. Nor did it inform Mais that Fabian was no longer licensed to sell insurance in Michigan or no longer authorized to open or accept checks for new accounts.  In fact, as a policy matter, Allianz does not inform its clients when their agent is terminated "without cause."  It is no surprise then, that Mais thought nothing had changed.  The last official word Mais had received from Allianz was that Fabian, an agent in good standing, was fully authorized to open accounts and accept checks for new and existing accounts.

### D.     Allianz Accepts New Business from Mais Generated by Fabian After Fabian's Termination

After his 2007 termination, Fabian encouraged Mais to buy a new Allianz product.  Mais agreed.  On February 7, 2008, he wrote a check to Allianz for $261,500 for a new Allianz annuity. Everything about the process seemed normal to Mais.  He and Fabian completed the Allianz application in the same manner as before, and, as usual, Mais made his check payable to Allianz. Allianz cashed the check and accepted the business even though Fabian was not supposed to be selling new Allianz annuities.  Fabian sent the new business to Allianz in the name of another Allianz agent, Barbara Kelsey, operating from Fabian's office.  Mais was not aware of this.  From his perspective, the transaction was exactly like the original four purchases he made from Allianz through Fabian.

### E.     Allianz's Agent Steals Mais's Checks

In March 2008, Mais wanted to create a funding mechanism for an educational trust to benefit his children and grandchildren.[1]  Mais and Fabian filled out an application together, and Mais gave Fabian a check for $121,000 payable to "Allianz Trust Account."  Everything about the process seemed normal.  This time, however, Fabian stole Mais's check.  Instead of delivering it to Allianz, Fabian deposited it into an account for his personal use.  On August 14, 2008, the process repeated itself.  Mais gave Fabian another check intended to fund the educational trust.  This check was made payable to "Allianz" in the amount of $82,671.92.  Fabian stole this check, too.

At the time Fabian stole these checks, Fabian continued to have actual authority to accept checks from existing customers, like Mais, for Allianz.  Allianz never communicated to Mais any limit on Fabian's authority before Fabian stole the checks.  Nor did Allianz monitor Fabian's day-to-day activity to ensure he was not exceeding the bounds of his limited authority in 2008 or 2009.  To the contrary, Allianz actually accepted new business from Mais in February of 2008, just a month before Fabian stole Mais's check.  Moreover, between the March and August 2008 thefts, Allianz sent Mais a new customer "welcome" letter, further reinforcing Mais's sense that the relationship between Fabian and Allianz was unchanged.

---

[1]In its closing brief, Allianz argues that Mais lacks standing because the investment was supposed to be for Mais's grandchildren, not for Mais himself.  The Court disagrees.  First, for Article III purposes, it is clear that Mais suffered an injury-in-fact.  Second, to the extent that Allianz disputes whether Mais is the real party in interest, regardless of what Mais ultimately intended to do with his investment, it was his money and he entrusted it to Allianz through Fabian.  In this context, Mais is a real party in interest.

**F. Allianz Investigates Fabian but Fails to Take Action**

In early 2009, Allianz received two complaints about Fabian. The first complaint was that a client had given Fabian funds to open an Allianz policy but the policy had not been opened. The second complaint was that Fabian had been making sales presentations and meeting with clients to process Allianz applications even though Barbara Kelsey, one of Fabian's associates and another Allianz agent, was nominally listed as the agent opening the new accounts. A common theme of both complaints was that Fabian was opening accounts or accepting checks for new accounts, contrary to his limited authority with Allianz. Moreover, the first complaint suggested the very real risk of theft of client funds.

Barbara Krueger, an Allianz special investigator, investigated the complaints. She generated a broker-specific Financial Industry Regulatory Authority ("FINRA") report about Fabian. It documented a pending investigation of Fabian involving a potentially fraudulent real estate dispute. No disciplinary action had been recommended or taken at the time. There were no other investigations. The record evidence suggests that Krueger did not continue to monitor the pending investigation for its resolution.

Krueger also investigated Barbara Kelsey. In mid-February 2009, Krueger sent letters to clients disguised as a "routine" survey from Allianz to Kelsey's clients. (Def. Ex. DD.) The survey inquired into the name of the client's Allianz agent, how the client met the agent, and whether the client had any questions or concerns about the policy. Mais received one of these letters because Kelsey was listed as the agent for his February 2008 annuity, even though Mais had applied with Fabian. The letter appeared routine, and Mais did not respond. Nor did he have any reason to do so. Everything seemed completely normal, and Allianz had told him nothing to suggest otherwise.

In mid-March 2009, Krueger sent a follow-up letter with her original letter enclosed. It indicated that if Allianz did not hear from Mais, it would "assume your policy records are accurate, and you remain satisfied with your policy." (Def. Ex. DD.) Again, Mais did not respond to what appeared to be a routine survey. Ultimately, even though Allianz had reason to believe Fabian was opening accounts and accepting checks for new accounts beyond the scope of his authority and reason to suspect Fabian was misapplying customer funds, it declined to take action.

### G.    Allianz Terminates Fabian with Cause

In early 2010, Krueger investigated a third complaint about Fabian. She discovered that Fabian had modified or created documents on Allianz letterhead without authorization. Detecting fraud, Allianz terminated Fabian for cause. It sent Fabian's clients a brief letter stating that Fabian was "no longer contracted with Allianz life," and was "no longer authorized to provide ongoing service" of Allianz products. (Pl. Ex. 17.) The letter did not give a reason for Fabian's termination or provide any warning that the clients' accounts may have been compromised.

Mais asked Fabian about the letter. Fabian explained that he was no longer working with Allianz because its commissions were too low. Absent any word from Allianz, all Mais knew was that his longtime Allianz agent was no longer an agent. He didn't know Fabian had been fired for fraud, and he had no reason to believe Fabian was unlicensed to sell insurance in Michigan.

### H.    Criminal Investigation

The FBI investigated Fabian. The government filed a felony information on May 16, 2011, charging Fabian with wire fraud. On June 9, 2011, Fabian pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1343. An FBI agent informed Mais for the first time in January 2012 that Fabian had stolen his 2008 checks. The Court sentenced Fabian on February 27, 2012. The Court's

criminal judgment against Fabian lists Mais as a victim in the total amount of $431,192.92, which includes the two converted checks. Mais also brought a civil lawsuit against Joseph Fabian and his family that resulted in a consent judgment with the Fabian Family Trust for $75,000. (Def. Ex. LL.) *See Mais v. Fabian*, No. 1:11-CV-1094 (W.D. Mich).

## II.     FRAUD CLAIM

Mais's first claim is that Allianz is vicariously liable for Fabian's fraud. Applying applicable agency law, the Court agrees. "An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Meretta v. Peach*, 195 Mich. App. 695, 697–98, 491 N.W.2d 278, 280 (1992) (citing Restatement (Second) of Agency § 15).[2] "The test of whether an agency has been created is whether the principal has a right to control the actions of the agent." *Id.* (citing *Little v. Howard Johnson Co.*, 183 Mich. App. 675, 455 N.W.2d 390 (1990)).

An agent's authority may be actual or apparent. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency: Actual Authority § 2.01 (2006). By contrast, "[a]pparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency: Apparent Authority § 2.03 (2006). "Apparent authority must be traceable to the principal and cannot be established by the acts and conduct of the agent." *Meretta*, 195 Mich. App.

---

[2]The parties agree that Michigan law applies in this case, and the Court concurs.

at 699, 491 N.W.2d at 280 (citing *Smith v. Saginaw Sav. & Loan Assoc.*, 94 Mich. App. 263, 288 N.W.2d 613 (1979)).   "Apparent authority may survive the termination of actual authority." Restatement (Third) of Agency: Apparent Authority § 2.03 cmt. a.  "As to the third person, apparent authority when present trumps restrictions that the principal has privately imposed on the agent.  The relevant appearance is that the principal has conferred authority on an agent."  *Id.* at cmt. c.  "In determining whether an agent possesses apparent authority to perform a particular act, the court must look to all surrounding facts and circumstances."  *Meretta*, 195 Mich. App. at 699, 491 N.W.2d at 280.

"[A] principal may be vicariously liable for an agent's tortious conduct based upon an apparent authority theory, if the principal cloaked its agent with apparent authority, i.e. held the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority."  *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998).  "Under an apparent authority theory, vicarious '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business provided to him.'"  *Id.* (quoting *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566–67 (1982)).  "Accordingly, liability may be imposed on a principal under an apparent authority theory irrespective of whether the agent acted for his own purposes, rather than those of his principal."  *Id.* (citing Restatement (Second) of Agency § 262 (1958)).

It is undisputed that in 2008 Fabian retained actual authority to accept checks on behalf of Allianz for existing accounts.  Thus, if Mais had given Fabian the checks at issue in this case for an

existing account, there would be no dispute that Fabian had actual authority to accept the checks. However, Mais testified, and the Court finds credible, that Mais intended to establish a new Allianz account in March 2008. And he intended to add his August 2008 check to that account. The dispute, then, is one of apparent authority. The question is whether an ordinarily prudent person would be justified in believing that Fabian had authority to accept funds to open a new Allianz policy. *See id.* Applying the applicable law, the Court finds that an ordinarily prudent person would have been reasonable to believe Fabian had authority to accept Mais's checks in 2008. Accordingly, Allianz may be held vicariously liable for Fabian's actions.

In this case, there is no question that Allianz hired Fabian as its agent in 1998. As such, Fabian had actual authority to open Allianz accounts, accept checks for new or existing accounts, and service existing accounts. Fabian retained this actual authority until August 2007. When it terminated Fabian without cause in 2007, Allianz failed to communicate a change in Fabian's authority to Fabian's clients. An ordinarily prudent client would therefore have been reasonable to believe that Fabian continued to have authority to accept checks to open new accounts. The facts and circumstances surrounding the three-way relationship between Mais, Fabian, and Allianz support Fabian's apparent authority to open new Allianz accounts and accept checks for those accounts.

The facts of this case are similar to those of *Meretta v. Peach*, 195 Mich. App. 695, 491 N.W.2d 278. In *Meretta*, the court considered whether the plaintiff had created a genuine issue of material fact regarding defendant's apparent authority. One of the defendants was a mortgagor who had paid her mortgage in full to a mortgage servicing company that had previously had actual authority to accept checks on behalf of the mortgagee. 195 Mich. App. at 696–97, 491 N.W.2d at 279. After accepting her payment, the servicing company went bankrupt and failed to deliver her

payment to the plaintiff.  *Id.*  The plaintiff brought action to foreclose on the mortgage and the trial court granted summary disposition.  *Id.*  The Michigan Court of Appeals reversed, finding that, under all the facts and circumstances, there was at least a question of fact whether the servicing company had apparent authority to accept payment on behalf of the plaintiff.  195 Mich. App. at 696, 491 N.W.2d at 279.  In particular, the court noted that the plaintiff failed to give the defendants notice that it had terminated the servicing company's authority to collect payments.  195 Mich. App. at 699, 491 N.W.2d at 280.

As in *Meretta*, it is undisputed that Allianz failed to inform Mais that Fabian was no longer authorized to accept checks for new Allianz products.  Apparent authority can survive termination of actual authority when the change in actual authority is not communicated to a third party.  From Mais's perspective, Fabian had apparent authority to accept Mais's checks in 2008.

At least two other Michigan cases support this conclusion.  In *Dick Loehr's, Inc. v. Secretary of State*, 180 Mich. App. 165, 446 N.W.2d 624 (1989), the court held that a car salesman's fraudulent misrepresentation could be imputed to the car dealership on the basis of the salesman's apparent authority.  In that case, the court clarified that the issue was not whether the salesman had the apparent authority to make "fraudulent" representations, but rather, whether the salesman had the apparent authority to make representations like the ones at issue in the case.  180 Mich. App. at 167, 446 N.W.2d at 625.  Finding that the salesman had apparent authority to make such representations, the court held the dealership liable for the salesman's actions.  180 Mich. App. at 169, 446 N.W.2d at 626.  Similarly, in *Michael v. Kircher*, 335 Mich. 566, 56 N.W.2d 269 (1953), the Michigan Supreme Court held a principal car dealership liable for the fraud of its agent car salesman on the theory of apparent authority.  There, the court held that under all facts and

circumstances the salesman had apparent authority to sell certain cars even though he lacked actual authority. These cases support that Allianz may be responsible for Fabian's fraudulent actions where Fabian had apparent authority to accept Mais's checks to open a new account.

Allianz argues that it cannot be liable for Fabian's fraud—even if he was acting with apparent or actual authority—because the Michigan Supreme Court has declined to hold employers liable for the criminal actions and intentional torts of their employees. After careful review, the Court finds these cases legally and factually distinguishable from the case at hand.

In *Zsigo v. Hurley Medical Center*, 475 Mich. 215, 716 N.W.2d 220 (2006), for example, a plaintiff sought to hold a defendant-employer vicariously liable for the intentional torts of its employee. There, the plaintiff was a patient in the defendant hospital and alleged that its employee had sexually assaulted her. The court rejected plaintiff's tort claim, reasoning that plaintiff's theory of liability in the employment context amounted to a strict liability standard for unforeseen acts. Specifically, the court observed that, under the doctrine of respondeat superior, an employer is not normally liable for the torts intentionally or recklessly committed by an employee when the torts are beyond the scope of the employer's business. The court considered whether an exception to the normal employer-employee relationship was applicable, such as whether an employer may be held liable when the employee was aided in accomplishing the tort by the existence of an agency relationship. The court held that Michigan had not adopted the aided-by-agency exception to liability under the doctrine of respondeat superior. It explained that such an exception "swallows the rule and amounts to an imposition of strict liability upon employers" because it is difficult to conceive of an instance in which an employee is not, by virtue of his employment relationship with the employer, "aided in accomplishing" the tort. 475 Mich. at 226, 716 N.W.2d at 226.

Similarly, in *Hamed v. Wayne County*, 490 Mich. 1, 803 N.W.2d 237 (2011), the Michigan Supreme Court considered an employer's liability for an employee's sexual assault of a county jail inmate. *Hamed* involved a Michigan Civil Rights Act claim for quid pro quo sexual harassment, as opposed to an intentional tort. 490 Mich. at 5, 803 N.W.2d at 241. As in *Zsigo*, the *Hamed* court concluded that Michigan had not adopted the aided-by-agency exception to the doctrine of respondeat superior, and that it would not hold an employer liable for the unforeseeable criminal actions of its employees. 490 Mich. at 36, 803 N.W.2d at 258.

*Zsigo* and *Hamed* are legally and factually distinguishable from this case. As an initial matter, the courts decided the cases on the basis of employment law, not agency law. This case—involving an insurance agent and its non-employee agent—implicates a straightforward application of agency law. Employment law and agency are distinct, and their distinctions often demand different results.[3] To the extent that *Zsigo* and *Hamed* referenced agency law, the courts considered only the aided-by-agency principle, which is not at issue in this case. These cases are legally distinguishable.

They are also factually distinguishable. Even if this were an employment case, and it is not, it is doubtful that *Zsigo* and *Hamed* would control. The common inquiry uniting these cases is

---

[3]Agency law may reasonably impute liability even in a situation where employment law would not. The costs of hiring an employee are generally higher than the costs of hiring an agent to accomplish the same purpose. An employee subjects the employer to a tax, for example, and generally builds in structural costs for fringe benefits, unemployment compensation, and workers compensation. Agents do not subject a principal to similar costs. Employees are also generally subject to more in-house, on-site supervision than are third-party agents like Fabian. For Allianz, it is cheaper and easier to build a far-flung sales force with agents than with traditional employees. There is nothing wrong with that. But when the far-flung agent, acting with apparent authority, steals customer funds, it is not unreasonable to pass the liability upstream to the principal. The risk of theft is built into the structure of the agency system of sales and marketing.

whether the risk of wrongdoing is within the reasonable scope of employer or principal contemplation, even apart from any prior notice based on actual misconduct. Every occupation necessarily entails a risk of wrongdoing. Some risk is far more foreseeable. The law imputes liability to an employer or principal of foreseeable risk so that the employer or principal takes the necessary precaution against the risk before it is realized. Consider, for example, a bank teller or customer service representative employed by a bank to handle customer money. If the teller slips a customer's money into her own pocket, the bank is surely liable, even if it had no prior knowledge of the teller's criminal propensity. The private market has recognized as much by developing products to hedge such risk.[4] This simply reflects the commercial reality that theft or other misappropriation of money is a predictable, inherent risk in businesses that exist to handle other people's money. This is all the more true when the financial services principal terminates one of its agents, fails to inform the existing customer, and leaves the agent in the field with actual authority to receive additional money from its customers and collect ongoing commissions on existing products.

Applying Michigan law to the facts of this case, Allianz may be held vicariously liable for Fabian's actions.

---

[4] *See, e.g.*, Bond: Fidelity Bond, Black's Law Dictionary 212 (10th ed. 2014); *see generally* Scott L. Schmookler, *The Compensability of Third-Party Losses Under Fidelity Bonds*, 7 Fidelity L.J. 115 (2001) (describing employee theft and employee dishonesty coverage). Countless insurance companies sell such coverage. Allianz Australia Insurance Limited, for example, appears to sell employee dishonesty insurance. *See Employee Dishonesty*, Allianz Business Pack, at 48–49, http://www.allianz.com.au/internet/allianz_amex.nsf/docs/DB23C5BE52214359CA25711E0015 68AB/$FILE/POL061BAFI-Allianz+Business+Pack+Policy+10.05.pdf.

### III.    NEGLIGENCE CLAIM

Mais's final claim is that Allianz was negligent for failing to exercise due care.  To establish a prima facie case of negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the defendant's breach was a proximate cause of the plaintiff's damages, and (4) the plaintiff suffered damage.  *See Hill v. Sears Roebuck & Co.*, 492 Mich. 651, 660, 822 N.W.2d 190, 195 (2012).  The parties dispute the first three elements.

#### A.    Duty

The Court finds that Allianz had a contractual duty to act with due care.  "Duty" is a legally recognized obligation "to conform to a particular standard of conduct to protect others against unreasonable risks of harm." *Burnett v. Bruner*, 247 Mich. App. 365, 368, 636 N.W.2d 773, 775 (2001) (quoting *Riddle v. McLouth Steel Prods. Corp.*, 440 Mich. 85, 96, 485 N.W.2d 676, 681 (1992)).  "[E]very person who engages in the performance of an undertaking has an obligation to use due care or act so as not to unreasonably endanger the person or property of another." *Schenk v. Mercury Marine Div., Lowe Indus.*, 155 Mich. App. 20, 25, 399 N.W.2d 428, 431 (1986).  Undertaking to perform a service may give rise to a duty to a person who might foreseeably be injured by the failure to perform the service with reasonable care.  *See, e.g.*, *Braun v. York Props., Inc.*, 230 Mich. App. 138, 146–49, 583 N.W.2d 503, 507–08 (1998).  Persons "foreseeably injured by the negligent performance of a contractual undertaking are owed a duty of care." *See, e.g.*, *Joyce v. Rubin*, 249 Mich. App. 231, 243–44, 642 N.W.2d 360, 366–67 (2002).  Under certain circumstances, this duty even extends to noncontracting third-parties. *Davis v. Venture One Const., Inc.*, 568 F.3d 570, 575 (6th Cir. 2009) (applying Michigan law).  Factors relevant to determining

14

whether a duty exists include the foreseeability of harm, degree of certainty of injury, closeness of connection between the conduct and the injury, moral blame attached to the conduct, policy of preventing future harm, and burdens and consequences of imposing a duty and the resulting liability for breach. *Brown v. Brown*, 478 Mich. 545, 553, 739 N.W.2d 313, 317 (2007) (internal quotation marks omitted).

It is undisputed that Allianz and Mais had—and continue to have—a contractual relationship. (Pl. Ex. 5, 6 & 10.) Accordingly, Allianz had a duty to service Mais's account with due care. Moreover, the facts and circumstances surrounding Allianz's third-party agent business model compel this Court to find that Mais was a foreseeable victim of Allianz's failure to exercise due care.

First, the harm was foreseeable. Allianz intentionally structures its business through third-party insurance agents. Using this system, Allianz relies on third-party agents like Fabian to open accounts, accept checks to open accounts, and service existing accounts. Such a business can and should anticipate that an agent who discontinues his association with the insurance company but is authorized to service existing accounts—including accepting checks on behalf of the insurance company—may convert client funds. Such a business can and should also anticipate that the client will believe the agent has the same authority until the business informs the client otherwise. A client's delivery of a check to an agent without actual authority is entirely foreseeable. As is the possibility that a third-party agent would convert the check. This is especially true where Allianz does not have day-to-day contact or direct oversight of its third-party agents.

Second, the degree of certainty of injury supports the existence of a duty. Allianz's business structure and policies against informing customers of certain kinds of agency terminations make it highly likely that a limited agent like Fabian could injure a client by continuing to act as a full agent

15

in good standing.  Unless Allianz communicates a change in an agent's authority, a client will reasonably continue to assume the agent has authority to accept checks to open new accounts.

Third, the closeness of connection between the conduct and the injury favors existence of a duty.  The conduct at issue here is Allianz's failure in 2007 to inform Mais of Fabian's change in authority or lapsed insurance license.  Also relevant is Allianz's failure in 2010 to communicate to Mais that Fabian engaged in fraudulent activity or was terminated for cause.  But for Allianz's failure to inform Mais in 2007, there is a substantial likelihood that Mais would not have given checks intended for Allianz to an unauthorized agent, nor would he have purchased an insurance policy from an unlicensed agent.  Additionally, if Allianz had informed Mais of Fabian's termination for cause or otherwise explicitly warned Mais to review his statements for fraud, Mais likely would have discovered the conversion.[5]

Fourth, regarding "moral blame" for the conduct, there are several blameworthy parties. Indeed, the blame for Fabian's fraud should fall on Fabian more than Allianz.  Relative to Mais, however, Allianz is not without some blame.  Prior to 2008, Allianz terminated Fabian's authority to accept Allianz checks for new accounts *but elected not to inform Mais*.  Having no reason to believe Fabian's authority had changed, Mais gave him two checks.  No later than early 2009, customer complaints alerted Allianz to the undeniable fact that Fabian continued to market Allianz

---

[5]The date of Mais's discovery of Fabian's fraud is relevant because Allianz argues that until mid-2011 Mais would have been able to mitigate his damages by bringing a claim against his bank. *See* Uniform Commercial Code § 4-401.  Such a claim may now be time-barred.  There does, however, appear to be case law suggesting that the statute of limitations for a contribution action does not begin to run until the cause of action accrues, which is when "a judgment has been taken or rendered and the third-party plaintiff had paid more than his aliquot share."  *See Sziber v. Stout Tausch*, 419 Mich 514, 533–34, 358 N.W.2d 330, 338 (1984).  Whether Allianz would have a viable contribution claim based on a judgment entered against it in this case is an open question that the Court does not need to resolve at this time.

products and open new accounts, ostensibly through Barbara Kelsey. Again, Allianz chose not to inform Mais. Even when Allianz actually confirmed fraudulent activity by Fabian, it still elected not to inform existing customers like Mais. With respect its repeated inaction, Allianz has at least some moral blame.

The final factors also weigh in favor of the existence of a duty. They ask whether imposing a duty in these circumstances would prevent future harm and weigh the relative burdens and consequences of imposing a duty. An insurance company may elect to terminate an agent without cause, but when it fails to inform its clients of this change to the agent's authority, it must bear the foreseeable risk of harm. Imposing a duty on Allianz to inform clients of significant changes in an agent's authority is likely to prevent future harm. With respect to the relative burdens and consequences, the burden on insurance companies to inform their clients of significant changes in an agent's duty is minimal. In this case, the burden would have been limited to a letter informing Mais that Fabian was no longer authorized to undertake specific activities, and, possibly indicating that Fabian was no longer licensed to sell insurance in Michigan. The longer Allianz waited, the less chance Mais had to prevent or mitigate damage. After 2010, the burden may have been greater. Indeed, it was reasonable for Allianz to limit the risk of liability for defamation by choosing not to publish its allegations against Fabian. However, Allianz could have taken some action to alert Mais to the possibility that his accounts were compromised. This would have been dramatically more effective than sending a letter disguised as a "routine" survey that failed to put Mais on notice of his possible exposure. Ultimately, even in 2010, the burden on Allianz of holding it to a duty of due care was minimal.

Balancing these factors, Allianz had a duty to exercise due care in its contractual relationship with Mais.

### B.    Breach

Allianz argues that it did not breach its duty because it terminated Fabian in 2010.  This argument is unpersuasive.  At issue is Allianz's duty to service Mais's contract with due care. Allianz terminated Fabian without cause effective August 2007. It failed to inform Mais that Fabian lacked authority to open accounts or accept checks for those accounts, or that Fabian lacked an insurance license.  At that time, Mais had already purchased four policies and Allianz had reason to believe Mais might purchase another.  In fact, Mais did purchase another in early 2008.  By February 2009, Allianz knew that there were at least two complaints against Fabian, both of which clearly indicated that Fabian was still selling Allianz products or opening accounts—even though Kelsey was nominally listed as the agent.  At a minimum, Allianz knew that Fabian was accepting checks from Allianz customers.  Nonetheless, Allianz elected not to contact Fabian's clients to inform them that Fabian was not authorized to open Allianz accounts or sell life insurance in Michigan.  Quite the opposite, it sent Mais a letter disguised as a routine survey asking if he had any complaints. From this evidence, the Court draws the reasonable inference that Allianz knew no later than early 2009 that Fabian continued to sell Allianz products and accept checks on Allianz's behalf but did not stop him because Allianz benefitted from the sales.  This was a breach of duty.

By early 2010, Allianz suspected that Fabian had engaged in fraudulent activity and terminated him for cause.  At that time, Allianz informed Fabian's clients that Fabian was "no longer contracted with Allianz life," (Pl. Ex. 17) but failed to give Mais any reason for concern.  The language of the letter was entirely routine despite Fabian's termination for fraud.  Indeed, when Mais

asked Fabian about the termination, Fabian explained that he had elected not to continue with Allianz because its commissions were inferior.  Mais had no reason to expect the story was darker because Allianz did nothing to put Mais on notice of the need to investigate.

The Court concludes that Allianz breached its duty to inform Mais of information highly relevant to Mais's purchase decisions.  At a minimum, Allianz breached this duty in early 2009. Moreover, Allianz's unique third-party agent business model compels the Court to find that Allianz also breached its duty in 2007 by failing to inform Mais that his longtime agent who had opened multiple policies for him was no longer authorized to open Allianz accounts or accept checks for new accounts.  Under the facts and circumstances, this was also a breach of duty.

### C.  Proximate Cause

The parties do not dispute that Fabian's fraud was a proximate cause of Mais's damages. Allianz strictly disputes that informing Mais of Fabian's change in authority or lack of licensure in 2007 or warning Mais of a potential fraud in 2010 would have prevented Mais's injury.  Specifically, it argues that even if it had informed Mais, Mais would have invested with Fabian.  Thus, to the extent that Allianz argues Mais's injury was inevitable, Allianz disputes the element of proximate cause.

"In order to be a proximate cause, the negligent conduct must have been a cause of the plaintiff's injury and the plaintiff's injury must have been a natural and probable result of the negligent conduct."  *O'Neal v. St. John Hosp. & Med. Ctr.*, 487 Mich. 485, 496, 791 N.W.2d 853, 858 (2010).  "These two prongs are respectively described as 'cause-in-fact' and 'legal causation.'" *Id.* (citing *Skinner v. Square D Co.*, 445 Mich. 153, 516 N.W.2d 475 (1994) and *Sutter v. Biggs*, 377 Mich. 80, 139 N.W.2d 684 (1966)).  "While legal causation relates to the foreseeability of the

consequences of the defendant's conduct, the cause-in-fact prong 'generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred.'" *Id.* (quoting *Skinner*, 445 Mich. at 163, 516 N.W.2d at 479).

In this case, Plaintiff has shown by a preponderance of the evidence that Allianz's failure to exercise due care in servicing Plaintiff's account was a cause-in-fact and legal cause of his injury. Its argument that Mais's injury was inevitable is unpersuasive. Allianz's argument unreasonably assumes that Mais would have opened a new account with Fabian and entrusted him with a $121,000 check payable to Allianz after learning that Fabian was no longer authorized to open new Allianz accounts or accept checks for new accounts. Moreover, the argument that Mais would have purchased a non-Allianz product with the converted funds is both speculative and assumes that Mais would have knowingly bought an insurance product from an unlicensed agent.[6] The record supports, and the Court finds, that Mais intended to open a new Allianz account when he gave Fabian a check payable to "Allianz Trust Account" in March 2008. He intended to supplement the funds in that new account when he gave Fabian a second check payable to "Allianz" in August 2008. The Court draws the reasonable inference that Mais would not have given Fabian a check to open a new account if he had known that Fabian was not so authorized to open new accounts. It is more likely than not that

---

[6]Because Allianz breached its duty of due care by failing to inform Mais of Fabian's change in actual authority in 2007, the Court need not reach the issue of whether Allianz would have independently breached its duty by failing to inform Mais that Fabian was no longer licensed to sell insurance in Michigan. However, if Allianz were required to inform Mais of Fabian's lack of licensure, Allianz cannot persuasively contend that Mais would have bought any insurance product after learning that Fabian was not licensed to sell insurance.

Mais would not have given Fabian the converted checks.  Allianz's breach of duty therefore constitutes both a cause-in-fact and legal cause of Mais's injury.[7]

## IV.   DAMAGES

Mais seeks $203,671.92 for the value of the converted checks.  He also requests exemplary damages.  The parties dispute whether Mais is entitled to exemplary damages and whether he failed to mitigate his damages.

### A.   Exemplary damages

Mais is not entitled to exemplary damages because he has not satisfied the requisite elements. "Exemplary damages are a class of compensatory damages that allow for compensation for injury to feelings." *McPeak v. McPeak*, 233 Mich. App. 483, 487, 593 N.W.2d 180, 183 (1999).  To justify an exemplary damages award, a defendant's conduct must be "so willful and wanton as to demonstrate a reckless disregard of plaintiff's rights." *Id.* (citing *Veselenak v. Smith*, 414 Mich. 567, 574, 327 N.W.2d 261, 264 (1982)).  "Due to the required mental element for exemplary damages, negligence is not sufficient to justify an award of exemplary damages." *Looney v. City of Detroit*, no. 04-CV-73514, 2005 WL 2072100, at *7 (E.D. Mich. Aug. 26, 2005).  In this case, Mais has not established by a preponderance of the evidence that Allianz's conduct was so willful and wanton as to demonstrate a reckless disregard for Mais's rights.

---

[7]To the extent that Allianz argues that its breach of duty did not proximately cause Mais's injuries because Mais's own negligence contributed to his failure to detect his loss until over three years after Fabian converted the checks, the Court addresses these issues below as a matter of mitigation.

## B.      Mitigation

Allianz argues that Mais failed to mitigate his damages by failing to detect Fabian's conversion until January 2012, over three years after the conversion.

As a preliminary matter, the Court considers whether Allianz's argument is a matter of comparative negligence or mitigation.   In Michigan, "[n]egligence subsequent to the injury is distinguished from contributory negligence, which is negligence which contributed proximately to cause the injury."   *Kirby v. Larson*, 400 Mich. 585, 617–18, 256 N.W.2d 400, 416 (1977). Mitigation, otherwise known as the doctrine of avoidable consequences, is thus distinguishable: where a party fails to use due care to prevent or reduce damages subsequent to the injury complained of, he may not recover his enhanced damages.  *Id.*; *see also* 22 Am. Jur. 2d. *Damages* § 352 (West 2014) ("Contributory negligence occurs either before or at the time of the defendant's wrongful act or omission; however, avoidable consequences and their associated damages generally arise after the wrongful act or omission.")   Michigan has since replaced contributory negligence with comparative negligence.  *See, e.g.*, *Placek v. City of Sterling Heights*, 405 Mich. 638, 275 N.W.2d 511 (1979). The purpose of the change was to "insur[e] that any recovery of damages by a plaintiff be reduced to the extent of his or her own negligent contribution to the injury."  *Id.* at 650 n.1, 275 N.W.2d at 514 n.1.   The adoption of comparative negligence, however, does not alter the fundamental distinction between contributory or comparative negligence prior to an injury and failure to mitigate damages after an injury.  *See, e.g.*, *Holton v. A+ Ins. Assocs., Inc.*, 255 Mich. App. 318, 326, 661 N.W.2d 248, 253 (2003).

In this case, Allianz argues that Mais failed to discover his damages in a timely manner after the injury occurred, not that Mais was comparatively negligent for causing the injury itself.   It was

Allianz's consistent position throughout trial that, in 2008, neither Allianz nor Mais had reason to believe that Fabian would convert Mais's checks.  Mitigation, not comparative negligence, is thus the relevant doctrine.

Michigan law recognizes a plaintiff's duty of ordinary care to mitigate personal damages. *See, e.g.*, *Zibbell v. Grand Rapids*, 129 Mich. 659, 661, 89 N.W. 563, 564 (1902).  A defendant bears the burden of showing that a plaintiff failed to "use such means as are reasonable under the circumstances to avoid or minimize the damages."  *Shiffer v. Bd. of Ed. of Gibraltar Sch. Dist.*, 393 Mich. 190, 197, 224 N.W.2d 255, 258 (1974); *see also McCullagh v. Goodyear Tire & Rubber Co.*, 342 Mich. 244, 255, 69 N.W.2d 731, 737 (1955).  "[A] claimant required to make reasonable efforts to mitigate damages is not held to the highest standards of diligence."  *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 123, 517 N.W.2d 19, 27 (1994).  "[T]he claimant's burden is not onerous, and does not require him to be successful in mitigation."  *Id.* (internal quotation marks omitted).

Michigan courts have not decisively determined when a plaintiff's duty to mitigate arises.  However, there is support for the proposition that the duty does not arise until the plaintiff knows or has reason to know of the defendant's breach of duty or the plaintiff's resulting injury.  In *Brown Brothers Equipment Company v. State*, 51 Mich. App. 448, 215 N.W.2d 591 (1974), for example, the State of Michigan contracted with a plaintiff business to cover a portion of the plaintiff's relocation costs during highway construction.  The plaintiff later maintained that it was entitled to certain damages incurred in reliance on the defendant's promise to perform.  *Id.* at 451, 215 N.W.2d at 593.  The court held that the plaintiff was not entitled to reliance damages because the "breach was obviously known to plaintiff," and, after the breach, the plaintiff "could not increase the damages for breach but should have minimized them once it was aware of defendant's intention."  *Id.* at 451,

215 N.W.2d at 593.  The court thus concluded that a plaintiff's duty to mitigate begins once the plaintiff is aware of the breach.  Similarly, in *Seaman v. Rindge, Kalmbach, Logie & Co., Ltd.*, 195 Mich. 417, 161 N.W. 919 (1917), the Michigan Supreme Court considered jury instructions on the issue of mitigation.  It explained that a plaintiff may only be required to mitigate his damages "[i]f he was in fact advised" of defendant's alleged breach.  *Id.* at 428, 161 N.W. at 922.  In *Holder v. Schwarcz*, nos. 307501, 309889, 2014 WL 354634 (Mich. Ct. App. Jan. 30, 2014), the court considered the relevance of evidence of plaintiff's knowledge of her injury in a dental malpractice case.  It observed,

> In the instant case, plaintiff's knowledge of her injury was directly related to the question of whether she made reasonable efforts to avoid or minimize her damages.  If plaintiff had no knowledge of this injury, she had no reason to take action to minimize her damages.  Thus, by arguing failure to mitigate, [the defendant] put plaintiff's knowledge of her injury at issue.

Id. at *4.  The court thus determined that a plaintiff's knowledge is relevant to whether she is obligated to mitigate her damages.[8]

In the instant case, Allianz argues that Mais should have investigated and detected his loss prior to January 2012.  Mais testified, and the Court finds credible, that Mais did not know of his loss or Allianz's breach until January 2012.  Accordingly, Mais was not legally obligated to take reasonable action to mitigate his damages before January 2012.  There is no persuasive evidence in

---

[8]A number of other state courts have held that a party's duty to mitigate damages does not arise until the party knows a breach has actually occurred.  *See, e.g.*, *Blumenthal Kahn Elec. Ltd. P'ship v. Bethelem Steel Corp.*, 120 Md. App. 630, 644, 708 A.2d 1, 7 (1998) ("[T]he plaintiff must be aware that he has sustained a loss; to require a plaintiff to mitigate damages that he does not know he has suffered would be patently unreasonable."); *see also Baird v. Crop Prod. Servs., Inc.*, nos. CA2011-03-003, CA2011-04-005, 2012 WL 3815314, at *7 (Ohio Ct. App. Sept. 4, 2012); *W. Consol. Co-op v. Pew*, 2011 S.D. 9, 795 N.W.2d 390, 406–08 (2011); *S.C. Johnson & Son, Inc. v. Morris*, 322 Wis. 2d 766, 774, 786–87, 779 N.W.2d 19, 23, 29 (2009).

the record that Mais should have known prior to 2012 that Fabian had converted his checks. Moreover, it is axiomatic that when a defendant is in a better position than a plaintiff to avoid the consequences, the doctrine of avoidable consequences is not available to reduce the plaintiff's recovery. 322 Am. Jur. 2d. *Damages* § 356 (West 2014).  Here, the trial record supports that at every stage prior to January 2012, Allianz had information that it withheld from Mais.  In 2007, it withheld the information that Fabian lacked actual authority to open new Allianz accounts or accept checks for new accounts.  It also withheld that Fabian lacked a Michigan insurance license.  In 2009, it had evidence that Fabian may have engaged in fraud or exceeded his limited authority with Allianz, but elected not to inform Mais of this.  Even in 2010, after Allianz terminated Fabian for fraud, Allianz did not fully inform Mais or otherwise encourage Mais to review his account statements for converted checks.  Allianz was in a better position to mitigate the loss than was Mais.  Because the burden is on Allianz to establish by a preponderance of the evidence that Mais did not exercise reasonable care to mitigate his damages, and Allianz has failed to satisfy this burden, the Court finds that Mais did not breach his duty to mitigate.

## V.     SET OFF

Finally, Allianz argues that this Court should set off the amount of Mais's damages by his recovery from collateral sources.  Trial evidence supports that Mais has entered a settlement agreement of $75,000 to extinguish a claim against the Fabian Family Trust.  (Def. Ex. LL.)  Mais also testified, and his attorneys represented on the pre-trial record, that Mais anticipates receiving $110,000 in restitution from Fabian's criminal case.  (Trial Tr., Vol. I, Docket #100, Page ID 1380.)

In Michigan, a plaintiff may "not recover more than a single recovery for [a] single injury." *Velez v. Tuma*, 492 Mich. 1, 14, 821 N.W.2d 432, 438 (2012).  "Common-law setoff is grounded in

25

the principle that an injured party is entitled to only one recovery for a single, indivisible injury and precludes an injured party from receiving a double recovery." *Id.* (Hathaway, J., dissenting).  "In general, absent a statutory mandate authorizing a setoff in a particular circumstance, setoff is a matter in equity." *Walker v. Farmers Ins. Exchange*, 226 Mich. App. 75, 572 N.W.2d 17, 19 (1997) (citing 20 Am. Jur. 2d § 11).

In this case, the Court applies the common law setoff doctrine as a matter of equity.  The record evidence supports, by a preponderance of the evidence, that Mais will recover $185,000 from collateral sources against his $431,192.92 in total losses.  A portion of the anticipated recovery, however, relates to civil or criminal allegations beyond the converted checks at issue in this case. Accordingly, to the extent that Allianz seeks to benefit from a set off, the Court will reduce the set off proportionally to the loss claimed in this case as a fraction of the total loss ($203,671.92/ $431,192.92 = 47.2 percent).[9]  The Court will credit Allianz 47.2 percent of the anticipated $185,000 recovery ($185,000 x .472 = $87,320).  In other words, the Court will reduce Mais's damages in this case by $87,320.  Reducing Mais's requested relief by that amount results in $116,351.92 damages in this case ($203,671.92 - $ 87,320 = $ 116,351.92).  The Court is satisfied that this reflects an equitable division of Mais's recovery as it relates to Allianz's liability for the converted checks. Allianz's total liability in this case is $116,351.92 plus $11,605.53 in prejudgment interest, for a total of $127,957.45.[10]

─────────────────

[9]Should the recovery be higher or lower than the parties anticipate, either party may file a motion for relief from this Court's judgment.  *See* Fed. R. Civ. P. 60(b)(6).

[10]Plaintiff seeks prejudgment interest.  Federal courts may use state law to calculate prejudgment interest, including on federal claims.  *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 497 (6th Cir. 2013).  Michigan Compiled Laws § 600.6013 provides for pre-judgment interest on money judgments in civil actions.  "[I]nterest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to

## VI.    CONCLUSION

For the reasons set forth above, Allianz is liable to Mais for $127,957.45.


**ACCORDINGLY, IT IS HEREBY ORDERED** that Allianz pay **$127,957.45** to Plaintiff.

A separate judgment will enter.


Dated:  July 22, 2014                                  /s/ Robert J. Jonker
                                                                        ROBERT J. JONKER
                                                                        UNITED STATES DISTRICT JUDGE

---

1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section.  Interest under this subsection is calculated on the entire amount of the money damage, including attorney fees and other costs."  Mich. Comp. Laws § 600.6013(8); *see also Chelsea Inv. Grp. LLC v. Chelsea*, 288 Mich. App. 239, 259, 792 N.W.2d 781, 794 (2010) (interpreting the statutory language).  Mais filed this lawsuit on March 23, 2012. (Docket #1, Page ID 5.)  Applying the applicable interval interest rates and statutory one percent, compounded annually, Mais is entitled to $11,605.53 in prejudgment interest.

        Plaintiff is also entitled to post-judgment interest under federal law.  *See* 28 U.S.C. § 1961; *see also Reed v. Country Miss., Inc.*, Nos. 93-6370, 94-5005, 1995 WL 348041, at *2 (6th Cir. June 8, 1995) (observing that 28 U.S.C. § 1961 applies to post-judgment interest in diversity and supplemental jurisdiction contexts).